

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-14-00145-CR
_____

CHRISTOPHER EVANS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 52nd District Court
Coryell County, Texas
Trial Court No. FAM-13-21662; Honorable Trent D. Farrell, Presiding

March 23, 2015

MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Following a plea of not guilty, Appellant, Christopher Evans, was convicted by a jury of aggravated assault with an affirmative finding on use of a deadly weapon.[1] Punishment was assessed by the trial court at twenty years confinement. By two

---

[1] TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011). As applicable to this case, a person commits aggravated assault by intentionally or knowingly threatening another with imminent bodily injury while using or exhibiting a deadly weapon during the commission of that threat. Id. at § 22.02(a)(2). A firearm is a deadly weapon. Id. at § 1.07(a)(17)(A). As indicted, the offense was a second degree felony punishable by confinement of not more than twenty years or less than two years and by a fine not to exceed $10,000. Id. at § 12.33(a).

issues, Appellant asserts the trial court erred by failing to grant his request for a jury charge instruction as to (1) a self-defense and (2) necessity. We reverse and remand.

BACKGROUND

Appellant and his former girlfriend, Kimberly, had a son together in 2010. After their relationship ended in March 2012, they entered into an informal visitation agreement whereby Appellant would contact Kimberly when he wanted visitation. The parties would meet and exchange possession of their son. Appellant would then return his son to her that evening or sometimes a few days later.

Towards the end of 2012, Kimberly was in a relationship with Kevin Drayton, the victim in the underlying case. Appellant and Kevin were not strangers to verbal altercations—face to face or by phone. On December 26, 2012, the child's birthday, Appellant asked for and was granted visitation. He picked the child up from Kimberly's apartment and agreed to return him later that day. According to Appellant, his son was not properly dressed for the cold weather which caused him concern.

During visitation, Appellant was potty training his son and discovered he had passed a ball bearing. He took him to the emergency room where an x-ray revealed a second metallic object still lodged in his intestines. He called Kimberly and informed her of the situation and asked for his son's Medicaid information. He also told her CPS and the police had been called and that he would not be relinquishing possession of his son. Appellant kept his son during the CPS investigation which eventually ruled out any neglect.

2

For approximately two weeks, Kimberly sent numerous text messages to Appellant asking to see her son. Kimberly's requests were refused. According to Appellant, during this time period, he received death threats by text messages from three separate numbers he could not identify but believed one of the numbers belonged to Kevin. Also during this time frame, Appellant had an attempted break-in at his apartment.

Hopeful that allowing Kimberly visitation would end the death threats, Appellant agreed to a meeting. They met in a grocery store parking lot during the evening hours of January 7, 2013. Appellant insisted they meet alone—without Kevin—and Kimberly acquiesced. Kimberly wanted her son returned, but Appellant intended for her to only visit with him. Once at the parking lot, they struggled for possession of the child and Appellant tried to take Kimberly's keys so she would not drive away with the child. At the moment, the child was not restrained in a car seat or seat belt. Unbeknownst to Appellant, Kevin was present at the location. Kevin, a larger man than Appellant, surprised him and stated something to the effect of "that's enough." Appellant, who testified he was scared, pulled a gun from his jacket and threatened Kevin to back away or he would die. Kevin complied and Appellant again attempted to take Kimberly's keys so she would not drive away with the child. Kevin then jumped Appellant from behind, wrestled him to the ground and disarmed him. During the scuffle, the gun fell from Appellant's grip and landed under his vehicle.

Patrol officers and an off-duty officer happened to be at a business across the street when they heard the fighting and responded. When they arrived at the scene,

3

Kimberly drove away with her son.[2] The officers separated and handcuffed both parties until the gun could be located. They interviewed two eyewitnesses, Kevin, and Appellant's current girlfriend, who had arrived in her own car during the scuffle. Appellant was placed in a patrol car. After statements were taken, Kevin and Appellant's girlfriend were released. Appellant was arrested for aggravated assault and transported to jail.

Appellant's trial strategy was that he pulled his gun on Kevin to defend himself and that his conduct was justified. During the charge conference, defense counsel asked for a self-defense instruction, although her emphasis was on a necessity instruction. The trial court denied both defensive instructions.

Appellant contends by two issues that the trial court erred in denying his requests for these defensive jury instructions. The State argues the trial court's ruling was proper, and if charge error exists, there is no showing of harm to Appellant. Because both issues require similar analysis, we will review them simultaneously.

STANDARD OF REVIEW

We review a trial court's denial of a requested jury instruction under an abuse of discretion standard of review. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). A trial court does not abuse its discretion when its decision is within the zone of reasonable disagreement. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). The denial of a defensive instruction is an abuse of discretion if the

---

[2] One of the officers instructed Kevin to call Kimberly and request that she return to the scene to answer questions. Kimberly left her son nearby with a cousin and returned to the scene.

defensive theory is raised by the evidence from any source and a charge is properly requested. *Shaw v. State*, 243 S.W.3d 647, 662 (Tex. Crim. App. 2007).

JURY CHARGE ERROR

An appellate court should review a claim of charge error pursuant to the standards discussed in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Review is a two-step process. First, a reviewing court must determine whether charge error occurred. Secondly, the reviewing court must determine whether the error is harmless. Charge error requires reversal when a proper objection has been made and the reviewing court finds "some harm," i.e., error that is calculated to injure the rights of the defendant. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If the court finds error that is not harmless, reversal is called for if the error has been properly preserved. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (citing *Almanza*, 686 S.W.2d at 171).

JURY INSTRUCTIONS—DEFENSIVE ISSUES

A defendant is entitled, upon a timely request, to an instruction on any defensive issue raised by the evidence provided that (1) the defendant timely requests an instruction on that specific theory and (2) the evidence raises that issue. *Rogers v. State*, 105 S.W.3d 630, 639 (Tex. Crim. App. 2003). A defendant is entitled to an instruction on every defensive issue raised regardless of whether the evidence is strong, feeble, unimpeached or contradicted, and even when the trial court thinks that the testimony is not worthy of belief. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). This rule is designed to insure that the jury, not the judge, will decide the

5

relative credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991).

To determine whether a defense issue has evidentiary support, we review the record in the light most favorable to the defendant. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). Additionally, a defendant's testimony alone is sufficient to raise a defensive issue. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987) (op. on reh'g). In analyzing whether a defendant was entitled to an instruction, the issue is not the truth or credibility of the defendant's testimony; the issue is whether the jury should have been instructed to decide those questions under the applicable law. *Id.* at 808.

## SELF-DEFENSE

Self-defense is the use of force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.31(a) (West 2011).[3] Entitlement to a self-defense instruction requires the defendant to admit the act alleged, including the culpable mental state, and produce evidence supporting the defense. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010). However, even if the evidence raises a claim of self-defense, a trial court does not err by refusing submission of that issue if the evidence conclusively establishes one of the exceptions listed in section 9.31(b) (listing circumstances where the use of force is not justified). *Dyson v. State*, 672 S.W.2d 460, 463-65 (Tex. Crim. App. 1984). Here, the State

---

[3] All future references to "§" or "section" are to the Texas Penal Code Annotated (West 2011).

contends Appellant's use of force was not justified because it was in response to verbal provocation alone. *See* § 9.31(b)(1).

## NECESSITY DEFENSE

Under the defense of necessity, unlawful conduct is justified if (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) the legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. *See* § 9.22. To raise a necessity defense, a defendant admits violating the statute under which he is charged and then offers necessity as a justification which weighs against imposing a criminal punishment for the acts which violated the statute. *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999). Admission of the violation of a statute includes every element including the culpable mental state. *Juarez*, 308 S.W.3d at 409.

## ANALYSIS

To be entitled to a defensive instruction pertaining to either self-defense or necessity, Appellant had to reasonably believe his conduct was "immediately necessary" to protect himself against a perceived threat of the use or attempted use of unlawful force by Kevin. *See* § 9.31(a). A "reasonable belief" is one that would be held by an ordinary and prudent person in the same circumstances as Appellant. *Walters v.*

7

*State*, 247 S.W.3d 204, 213 (Tex. Crim. App. 2007).[4]  A necessity defense adds that the conduct be immediately necessary to avoid "imminent" harm.  "Imminent" has been defined as ready to take place, near at hand; impending; mediate rather than immediate; close rather than touching, on the point of happening; threatening; menacing; perilous.  *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (citing various authorities including Black's Law Dictionary 676 (5th ed. 1979)).

As previously stated, in determining whether a defense issue has evidentiary support, we review the evidence in the light most favorable to the defendant.  Here, Appellant had served in the military from 1997 until he was honorably discharged in 2005, after receiving various service medals.  He attended Temple College with a goal of obtaining a business management degree.  He has a ten percent disability from his work in the military and has been diagnosed with PTSD, depression, personality disorder and alcohol dependency.

Appellant testified that when he and Kimberly first separated, their relationship was amicable but later became strained.  He first encountered Kevin when returning his son's diaper bag and car seat after a period of visitation.  Despite a few verbal confrontations between them, they did not really know each other.

As recited earlier, while Appellant was withholding possession of his son from Kimberly, he received death threats by text messages and a phone call from a man

---

[4] Under certain circumstances not applicable here, an actor's reasonable belief is presumed if the actor is not otherwise engaged in certain criminal activity.  *See* § 9.31(a)(3).  The State argues that based on the statute, Appellant was not entitled to a self-defense instruction because he was unlawfully carrying a weapon in violation of section 46.02, a Class A misdemeanor.  The State's argument is incorrect.  Criminal activity eliminates a presumption of reasonableness; it does not extinguish the opportunity for a self-defense instruction.  *See Villarreal v. State*, No. PD-0332-13, __ S.W.3d __, 2015 Tex. Crim. App. LEXIS 136, at *26-29 (Tex. Crim. App. Feb. 4, 2015) (concluding statutory presumption of reasonableness inapplicable).

which he could not positively identify as Kevin. There was also an attempted break-in at his apartment during the same time frame.

When Appellant agreed to meet Kimberly, he conditioned the meeting on Kevin not accompanying her.[5] During trial, Appellant admitted he had consumed alcohol before the meeting. He further testified he saw Kevin "creeping up" on him from the corner of his eye. His testimony continued, "I was scared and I pulled a gun out." He then admitted threatening Appellant by saying: "back the fuck up because this ain't got nothing to do with you or somebody going to die tonight . . . ." After Kevin backed away, Appellant discontinued his encounter with Kevin and again tried to get Kimberly's keys so she would not drive away with their son. It was then that Kevin jumped Appellant from behind and the two struggled.

Although Appellant's girlfriend failed to show for trial, the patrol car videos played for the jury show her arriving at the scene and being detained and placed in a patrol car until the situation could be resolved. She is heard on the officer's microphone stating that when she arrived, Kevin had a hold of Appellant from behind and Kevin had the gun. The officer questioned her story as being uncorroborated because other witnesses had named Appellant as the person holding the gun.

Upon realizing that Kevin was being released and he was being arrested, Appellant became upset and agitated. He yelled profanities and accused Kevin of

---

[5] The State argues that Appellant was not entitled to a self-defense instruction because use of force is not justified under section 9.31(b)(5) when the actor is carrying a weapon in violation of section 46.05 and he seeks an explanation from or discussion with the other person about their differences. In its brief, the State asserts Appellant knew Kevin would be at the meeting. The testimony, however, shows that Kimberly agreed to Appellant's condition that Kevin not attend the meeting. There is no support in the record for the State's contention that Appellant knew Kevin would be at the meeting or that Appellant "sought an explanation from or discussion with" Kevin concerning their differences.

9

attacking him. He was also angry that his son, whom he believed at that time was being neglected, was being taken from him.

The officer who interviewed Kevin believed his version of events and relayed that to the other officer. The second officer asked who started the fight and questioned whether Kevin should be charged with disorderly conduct for his part in the scuffle. The first officer discounted the idea of charging Kevin with the following explanation: "when someone pushes on your old lady you gonna stand there and say no, cut it out?" As a result, Kevin was never charged with any offense arising out of the incident.

An eyewitness who was walking to his truck at the time observed Kevin arrive in the parking lot and get out of his car. He described Kevin as sprinting across the parking lot. Kevin's "sprinting" must have appeared menacing because the witness anticipated a fight was about to occur. Before any confrontation between Appellant and Kevin started, he got into his truck and began honking his horn to get everyone's attention in hopes of averting a fight.

Evidence which raises a defensive issue, regardless of its strength or source, justifies the submission of an instruction as to that defense. *Juarez*, 308 S.W.3d at 404-05. Even a minimum quantity of evidence is sufficient if the evidence presented would support an affirmative finding pertaining to that defense by a rational jury. *Shaw*, 243 S.W.3d at 657-58. Here, Appellant has a much smaller stature than Kevin.[6] He testified he pulled his gun because he was scared. He admitted to threatening Kevin

---

[6] The officer who detained and handcuffed Kevin commented he had "big old hands."

and stating "somebody going to die tonight."[7] Given his strained relationship with his former girlfriend, his past encounters with Kevin, prior death threats, and the attempted break-in of his residence, it is not inconceivable that, at the time of the incident, Appellant reasonably believed Kevin's conduct posed an "imminent" threat to him. Furthermore, Kevin surprised Appellant by showing up for a meeting when he had been specifically asked to stay away. Therefore, it is reasonable to conceive Appellant believed use of force was immediately necessary to protect himself when he was confronted by Kevin. Given Appellant's testimony, his girlfriend's comments recorded on the patrol car video, the relative stature of each party, and the eyewitness's account concerning Kevin's "sprinting" across the parking lot, we believe a rational juror could have found Appellant reasonably believed harm was imminent and the use of force was reasonably necessary to protect himself from Kevin's use of force against him. Viewing the evidence in the light most favorable to Appellant, we conclude the record supports Appellant's request for the submission of both defensive instructions. Accordingly, the trial court abused its discretion by denying the requested instructions. Finding error in the court's charge, we proceed to a harm analysis.

HARM ANALYSIS UNDER ALMANZA

When, as here, a defendant objects to the charge at trial, he will obtain relief if the record shows he suffered "some harm." *Reeves*, 420 S.W.3d at 816. A reviewing court is required to consider the following: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence and (4) other relevant factors

---

[7] The State urges that Appellant did not admit he violated a statute because he later testified he "didn't feel like [he] assaulted anybody." This testimony merely presents a credibility issue because other evidence supports a finding that Appellant admitted each element of the offense.

present in the record.  *Id.*  This less-stringent standard still requires the reviewing court to find the defendant "suffered some actual, rather than merely theoretical, harm from the error."  *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008).

(1) ENTIRE JURY CHARGE

In the underlying case, the charge contains an abstract as well as an application section.  It sets forth and defines the elements for aggravated assault and also instructs the jury on the lesser-included offense of assault by threat.  It does not, however, contain any defensive instructions, which we have concluded were raised by the evidence.  The jury was not given the opportunity to decide the relative credibility of Appellant's defensive theories and whether to reject or apply them in this case.  Therefore, we find the charge as presented to the jury weighs heavily in favor of finding that Appellant was harmed.

(2) ARGUMENTS OF COUNSEL

During its opening argument, the State explained the evidence would show that Appellant and Kimberly fought over possession of their son and Kevin intervened.  The argument continued, "[Kevin] grabs the defendant to stop this physical tug of war . . . the defendant pulls a gun, points it at him and says you're going to die tonight."  The State referred the jury to patrol car videos that would be presented and asked it to assess the credibility of the parties involved to determine what occurred that night.  When presented, the patrol car video showed Appellant becoming upset, yelling profanities, and being in an agitated mood when he realized that Kevin was being released and he

12

was being arrested. The State wanted the jury to believe that Appellant's state of mind implicated him as the aggressor. However, Appellant testified he was upset and agitated because his son, whom he believed was being neglected, was being taken from him.

Closing arguments are not particularly informative—Appellant was denied defensive instructions during the charge conference so arguments did not reference self-defense or necessity. The State emphasized the offense of aggravated assault as opposed to the lesser offense of assault by threat and reminded the jury that Appellant admitted he exhibited a deadly weapon. Without any defensive instructions, defense counsel had no choice but to argue that Appellant did not intend to commit aggravated assault notwithstanding Appellant's admission of the offense during his trial testimony. Therefore, overall, counsel's arguments at trial weigh in favor of finding that Appellant suffered some harm.

(3) ENTIRETY OF THE EVIDENCE

Self-defense and necessity were contested issues. Appellant testified he committed aggravated assault. He testified to his history with his former girlfriend and expressed his concern regarding his son's well-being. Even Kevin's testimony confirmed that concern. Additionally, a disinterested third-party eyewitness sensed a confrontation was imminent based solely upon Kevin's demeanor when he arrived at the parking lot. Finally, Appellant's and his girlfriend's testimony, credible or not, were alone sufficient to raise these defensive issues. Depriving Appellant of a defensive instruction and the opportunity for the jury to evaluate the credibility of his defensive theories weighs heavily in favor of a finding of some harm.

13

(4) OTHER RELEVANT EVIDENCE

Appellant claims that interviews conducted at the scene determined his fate without being given an opportunity to explain his conduct. He testified he was visibly upset and agitated in the patrol car video, not because he was an aggressive individual, but because his son was being taken from him. Kevin, on the other hand, was released without any culpability notwithstanding the fact that one officer questioned whether he should have been charged with disorderly conduct.

In sum, Appellant's rights were violated by being denied the opportunity to have the jury consider the credibility of a defensive issue, a vital aspect of his case. *Cf. Villarreal*, 2015 Tex. Crim. App. LEXIS 136, at *29-31 (deciding that the appellant was not egregiously harmed by omission of one of two alternative defenses). After evaluating the *Almanza* factors under the less-stringent standard of "some harm," we find that the record supports Appellant's contention that he was harmed by the trial court's refusal to include these defensive instructions in the charge. Issues one and two are sustained.

CONCLUSION

The trial court's judgment is reversed and the cause is remanded for further proceedings.

Patrick A. Pirtle
Justice

Do not publish.

14